## GREENE v. FIRST SAVINGS & TRUST CO. OF TAMPA et al.

### In re PERRY.

Circuit Court of Appeals, Fifth Circuit. January 10, 1930.

No. 5588.

H. L. Anderson, of Jacksonville, Fla., for appellant.

K. I. McKay, of Tampa, Fla. (R. W. Withers, M. B. Withers, and Maynard Ramsey, all of Tampa, Fla., on the brief), for appellees.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

BRYAN, Circuit Judge. This was a suit by appellant, as trustee of the estate of N. A. Perry, a voluntary bankrupt, to set aside a conveyance, which before bankruptcy Perry had made of his property to appellees pursuant to an agreement between him and them, on the grounds that the conveyance was not supported by a valid consideration, was executed under duress, and was intended to hinder, delay, and defraud creditors of the grantor. It was brought against the First Savings & Trust Company of Tampa, Fla., and four other banks which were members of the Tampa clearing house association, namely, the Citizens' Bank & Trust Company, the First National Bank, the Exchange National Bank, and the National City Bank. The bank of Ybor City was also made a party defendant, but its connection with the agreement may be ignored, as its obligations thereunder were assumed by the Citizens' Bank.

The bill pleaded the agreement, charged duress and fraud in the most general terms, alleged that Perry included all his property in the conveyance upon insistence of the clearing house banks, and alleged that he was in fact insolvent on the date of the conveyance, but failed to allege that appellees then knew or had reasonable cause to believe that he was insolvent.

The answer did not specifically deny that appellees placed the bankrupt under duress, but did deny generally "all manner of collusion or fraud" charged in the bill, set out in detail the negotiations which led up to the making of the agreement and conveyance, and the manner in which the agreement had been performed by appellees.

N. A. Perry, the bankrupt, was president of three banks, the Merchants' & Mechanics', with a capital and surplus of $80,000, the Latin-American, with a capital and surplus of $70,000, and the Sulphur Springs, with a capital and surplus of $35,000. He owned a majority of the stock of the Merchants' & Mechanics', and had caused to be deposited in it without security $150,000 in cash and $50,000 of notes belonging to the Latin-American. He was personally indebted on notes in the sum of $18,000 to the Merchants' & Mechanics', and in the sum of $10,000 to the Latin-American. In addition, he and G. C. Rankin, a director of the Merchants' & Mechanics', by divers means had unlawfully used funds of that bank for their own benefit. The deposits of the Merchants' & Mechanics' in July, 1926, had fallen below the legal reserve. That bank was unable to return the loan which it obtained from the Latin-American. N. A. Perry, fearing a run on all three of the banks of which he was president, applied to the clearing house banks for a loan, which, after investigation, was declined, but, to save the Perry banks

from failure, an agreement was entered into on July 31, 1926, between Perry and Rankin on the one part and the clearing house banks on the other, pursuant to which Perry resigned as president of the three banks with which he was connected, procured the resignations of the directors of each, caused to be transferred to the First Savings & Trust Company a majority of the stock of each of such banks, all property which he claimed to own, and a note for $50,000 of his brother John H. Perry payable to his order. Rankin conveyed his interest in a certain mortgage, and agreed to pay all his indebtedness to the Perry banks at maturity. The clearing house banks on their part paid an amount equal to 2½ per cent. of the capital stock and surplus of each, aggregating $196,000, to the First Savings & Trust Company, to be advanced to the Perry banks to save them from failure. The trust company, in accordance with the agreement, transferred stock which it received as follows: That from the Merchants' & Mechanics' to the Citizens' Bank & Trust Company; that from the Latin-American to the First National Bank; and that from Sulphur Springs to the Exchange National Bank. The National City Bank did not receive any stock for its contribution to the fund of $196,000.

It was agreed that the trust company would sell the property conveyed to it by Perry, retire Perry's indebtedness evidenced by his notes payable to the banks of which he was president, and at the end of one year would return any surplus over and above the fund contributed by the clearing house banks, after deducting interest at the legal rate to N. A. Perry, Rankin, and John H. Perry, as they might jointly direct, and that the stock in each of the Perry banks would be bought by the clearing house bank which received it at book value. At the end of the year the losses sustained by the Perry banks indicated that each of them was insolvent at the date of the agreement, but they were either liquidated or protected from failure and kept in business by the clearing house banks which took them over. N. A. Perry had an experience of twenty years in the banking business. He and his brother John H. Perry testified that Faircloth, president of the National City Bank, while conferences were being held which resulted in the agreement, took them aside and threatened N. A. Perry with criminal prosecution unless the former signed the agreement and the conveyance of his property, and the latter contributed his note of $50,000; but this testimony was contradicted by Faircloth, and it is undisputed that none of the other representatives of the clearing house banks made any threat or suggestion of criminal prosecution. The president of each of the other clearing house banks who attended the conference testified that no threat or suggestion of criminal prosecution was made in his hearing or presence. N. A. Perry testified further that he made the statement at the conference that he was conveying all his property and that he owed "a lot of debts"; but in this statement he was contradicted by all the clearing house bankers, who testified that the question of his solvency or insolvency was not discussed or mentioned. The property conveyed by N. A. Perry under the agreement was of but little if any greater value than the amount represented by his notes to the Merchants' & Mechanics' and Latin-American banks.

The District Judge dismissed the bill upon final hearing of the evidence.

■ The agreement provided for an outright sale of a majority of the stock of each of the Perry banks. The consideration agreed to be paid by the purchasing banks was an amount which represented an aggregate of the debts of the bankrupt and Rankin, plus whatever sum was necessary to make good the losses sustained by the Perry banks. An estimate of this aggregate amount was the $196,000 advanced, but, as this estimate might prove to be too high, it was agreed that any excess should be returned jointly to the bankrupt, Rankin, and John H. Perry, the first two having made conveyances and the last named having contributed his note to secure the advance. After the purchase price had been so adjusted, the purchasers were to pay for the stock they had acquired at its book value. We are of opinion that the bankrupt received a valid consideration for his conveyance, in the payment of $196,000 to make good a substantially equal amount which he had caused to be withdrawn from the Latin-American Bank and placed in the Merchants' & Mechanics' Bank, in the obligation of the purchasers to pay his indebtedness of $28,000 to the two banks, and to pay him the book value of his stock in all the banks with which he was connected. The consideration appears to have been adequate, since the value of the bankrupt's property was about equal to the indebtedness represented by his notes. There is no support in the evidence for the contention of appellant that the clearing house banks at the time of the conveyance supposed the bankrupt's property had a value

considerably greater than the amount represented by his notes. The fact that the bankrupt was not indebted to the clearing house banks is immaterial, for the reason that the agreement operated to the benefit of himself and the Perry banks and to the detriment of the clearing house banks. 6 R. C. L. 654; 13 Corpus Juris, 325.

The appellees, while in their answer they did not categorically deny the charge in the bill that they had placed the bankrupt under duress, pleaded matters of defense which, if true, justified the District Judge in drawing the inference that the bankrupt executed the conveyance freely and voluntarily. The bankrupt was an experienced banker, and it is to be presumed that he, as well as Faircloth, was familiar with the banking laws which provide punishment for misapplication of bank funds. The bank of which Faircloth was president made its contribution to the fund raised to save the Perry banks from failure without the possibility of profiting by the agreement, since it did not acquire the right to obtain a controlling interest in either of them. It is undisputed that the representatives of the clearing house banks which took over the Perry banks made no threat or suggestion upon which the claim of duress could be founded, and the evidence does not tend to show that they had knowledge of the conversation which Faircloth held with the bankrupt and his brother.

■■■ We are of opinion that the evidence wholly fails to disclose that the clearing house banks were guilty of any semblance of fraud. It is a fair inference that the object of the clearing house banks was to prevent bank failures·and not to secure profits for themselves out of the transaction complained of. This was manifestly so in the case of the National City Bank, which made its contribution without chance or hope of profit. The bill does not allege that any of the clearing house banks knew that N. A. Perry was insolvent. The District Judge was justified in rejecting the bankrupt's testimony that, though he was conveying all his property, he was heavily indebted to unsecured creditors, and in relying instead upon the testimony of all the other bankers at the conference that the question of the bankrupt's solvency or insolvency was not mentioned. The conveyance could not be avoided by the fact of the bankrupt's insolvency, if that fact was unknown to appellees. One may acquire an unimpeachable title to property of an insolvent by a conveyance accepted in good faith upon a present consideration, although the effect of the conveyance be to hinder or to delay the grantor's creditors. If the purchaser is in good faith, the conveyance to him is valid under such circumstances, although the seller may have the intent to defraud his creditors. Coder v. Arts, 213 U. S. 223, 29 L. Ed. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008. Appellant relies upon Neubert v. Massman, 37 Fla. 91, 19 So. 625, which holds that a debtor in failing circumstances may not convey property and at the same time reserve to himself a secret interest. But in the instant case there was no reservation of an interest in the property conveyed by the bankrupt. The effect of the provision for a refund of any surplus that might remain after the purchasers had been reimbursed for the money they advanced was to correct any inaccuracy in the estimate placed upon the value of the property conveyed by the bankrupt and Rankin. The agreement did not disclose any facts which tended to show that, as a result of it, any money or property of the bankrupt would be held in trust for him by the purchasers in such manner as to defraud his creditors.

The decree is affirmed.